## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) | |
| **MAURICIO NAVARRO,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 13 C 427** |
| **v.** | ) | |
| | ) | **Chief Judge Rubén Castillo** |
| **MICHAEL ATCHISON, Warden,** | ) | |
| **Menard Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Mauricio Navarro, a *pro se* prisoner, is serving an 80-year sentence for a murder and related offenses committed in Cook County, Illinois. He filed a petition pursuant to 28 U.S.C. § 2254 (the "Petition") challenging his conviction. (R. 19, Pet.) For the reasons stated, the Petition is denied.

### BACKGROUND[1]

Following a jury trial, Navarro was convicted of the murder of Israel Lucena, the attempted murder of Fernando Escobedo, and aggravated discharge of a firearm. On direct appeal, the Illinois Court of Appeals set forth the facts underlying Navarro's conviction as follows:

> At trial, Fernando Escobedo testified that about 10:30 a.m. on March 15, 2005, he drove to a cell phone store near Diversey and Laramie Avenues on the northwest side of Chicago with Israel Lucena. He parked his car directly across the street from the store and went inside, leaving Lucena in the car. Escobedo noticed two members of the Ashland Vikings street gang inside the store, and then

---

[1] In deciding the Petition, the Court must presume the facts set forth by the state court are correct. 28 U.S.C. § 2254(e)(1). It is Navarro's burden to rebut this presumption with clear and convincing evidence. *Id.*

observed Adam Garcia, whom Escobedo knew as "Gordo," enter the store, speak with a clerk, then exit and drive away in a van.

Escobedo further testified that the store had glass doors and windows, and when he looked out of them at his car, he saw [Navarro] standing near the rear passenger side of the vehicle. Escobedo went outside and looked at [Navarro], whom he described as 5'6" tall, with a medium build, wearing a red top with white stripes, blue jeans, and "some red on his head too." After their eyes met, [Navarro] walked to the rear of his car, and stepped behind a van out of sight. [Navarro] then emerged from behind the van with a gun, pointed it at Lucena, and fired several shots. Escobedo ran to the car, and saw that Lucena was bleeding, and then looked up at [Navarro], who was about four or five feet away. [Navarro] turned around and ran, and Escobedo chased him into a parking lot where [Navarro] turned and fired two shots at him, forcing Escobedo to drop to the ground. [Navarro] then ran into an alley, entered a van, and drove away.

Escobedo was taken to a police station where he viewed a photo array and stated that one of the pictured individuals resembled the shooter. He also identified Garcia, and told the police that he saw him in the store. That night, Escobedo viewed a lineup at the station and did not identify anyone. On March 25, 2005, however, Escobedo viewed another photo array and identified [Navarro] as the shooter. On cross-examination, Escobedo stated that just after the shooting, he described the shooter to police as wearing a jacket and a red hoodie, but that at the time of trial, he was unsure about what was on his head, except that it was red.

Daniel Datil testified that about 10:30 a.m. on March 15, 2005, he was walking on Diversey Avenue near Laramie, when he saw [Navarro] emerge from the front of a van and lean against the door, holding something in his hand. [Navarro] was facing Datil and wearing a red jacket with white stripes and a red baseball cap. Datil, who was about 30 to 35 feet away from [Navarro] at this time, continued walking towards him. When Datil got within seven or eight feet, he could see that [Navarro] had a gun pressed up against his left leg, and then made eye contact with him for two seconds at a distance of four or five feet. Shortly after Datil passed [Navarro], he heard gunshots from behind and to his left, and started running. As he ran, he looked back and saw [Navarro] pointing a gun at a car.

Datil viewed a photo array at the police station after the shooting, and identified someone that looked similar to the shooter. He later viewed a lineup with that person in it, but did not identify anyone. On April 18, 2005, Datil was called back to the police station to view another lineup, and identified [Navarro] as the shooter. Datil remarked that [Navarro] had more hair at that time than he did at trial.

On cross-examination, Datil stated that when he first observed [Navarro], he could not see his face because he was looking down and it was covered by the bill of his cap. He also acknowledged his grand jury testimony, where he stated that [Navarro] looked at him for a quick second, and responded that he could not remember exactly how much time passed while he and [Navarro] looked at each other.

Adam Garcia testified that about 10:30 a.m. on March 15, 2005, he drove to a cell phone store on Diversey and Laramie Avenues with [Navarro]. At that time, [Navarro] was wearing blue jeans, a red coat, and a red cap, and, like Garcia, was a member of the Latin Styler street gang. When Garcia entered the store, there were three people inside, including two members of the Ashland Vikings, a rival gang to the Latin Stylers.

When Garcia returned to his van, he drove into a nearby alley at [Navarro's] direction. [Navarro] then told him to wait there and exited the vehicle. Garcia lost sight of [Navarro], and within seconds, heard seven or eight gunshots. He jumped out of the vehicle to see what was going on, and saw [Navarro] running towards him. He also saw one of the individuals who had been inside the cell phone store, but whom Garcia did not recognize as an Ashland Viking, chasing him.

[Navarro] was holding a black handgun, and Garcia saw him point it at the man chasing him and fire two shots. Garcia and [Navarro] both re-entered his van, and Garcia drove for a short distance down the alley before [Navarro] told him to stop and jumped out of the vehicle. Later that day, Garcia learned that the police were looking for him and were interviewing his child and the child's mother, so he turned himself in.

Garcia testified that several days later, he spoke with [Navarro] about the incident, and asked him what he was thinking. [Navarro] responded "that he didn't care. That he'd rather be in prison with his brother." Garcia explained that [Navarro's] brother was a member of the same gang and was on trial for the murder of an Ashland Viking at the time. [Navarro] said that he was worried that his brother might receive a lengthy sentence.

Officer David Luciano testified that about 10:30 a.m. on March 15, 2005, he responded to a call regarding a shooting at Diversey and Laramie Avenues. He spoke with Escobedo and prepared a report in which the offender was described as 5'6" tall with black curly hair.

Officer Zbigniew Niewdach, a forensic investigator with the mobile crime lab, testified that he collected seven cartridge cases at the scene of the shooting, and two more in a nearby alley. He also recovered a security video containing footage taken by an outdoor camera from a nearby restaurant.

Officer Leo Goduto testified that between March 22 and March 25, 2005, he received about four phone calls from [Navarro], with whom he had previously spoken on a number of occasions. On March 27, 2005, Officer Goduto again received a call from [Navarro], and advised him to turn himself in because he was a person of interest in the Lucena homicide, to which he responded, "I'm not turning myself in, they're gonna have to catch me."

Sergeant Michael Barz testified that he was working as a detective on March 15, 2005, and responded to the shooting with his partner. He interviewed Escobedo, who described the shooter as 5'6" tall and wearing a red top with white stripes at the shoulders. Sergeant Barz also showed Escobedo a photo array, and he identified Garcia as one of the individuals who was inside the cell phone store prior to the shooting. When shown another photo array, both Escobedo and Datil identified the same individual as resembling the shooter, but did not identify that individual in the separate lineups conducted later that day.

In the early morning hours of March 16, 2005, Sergeant Barz spoke with Garcia, who identified a picture of [Navarro]. On March 25, 2005, he presented Escobedo with a photo array that included [Navarro], and Escobedo identified him as the shooter. On April 18, 2005, Datil viewed a lineup that included [Navarro], and Datil identified him as the shooter.

Sergeant Barz further testified that on March 15, 2005, Officer Niewdach provided him with a surveillance tape from a nearby restaurant, from which he obtained still photograph. Escobedo, Datil, and Garcia each viewed the photographs, and each stated that the individual in the picture was wearing the same jacket that [Navarro] had on during the shooting.

(R. 16, State Ct. R., Ex. A, Ill. App. Ct. Order at 1-7.) Navarro was convicted by a jury of the murder of Lucena, the attempted murder of Escobedo, and aggravated discharge of a firearm. (*Id.* at 7.) The trial court sentenced him to an aggregate term of 80 years in prison. (*Id.*, Ex. B., Illinois Appellate Court Order at 4.)

Navarro filed a direct appeal, raising two claims: (1) the evidence was insufficient; and (2) the trial court abused its discretion in permitting Garcia to testify about Navarro's statement that he wanted to join his brother in prison. (*Id.*, Ex. C, Appellate Br. at 4.) The Illinois Court of Appeals rejected both arguments, and affirmed his conviction in all respects. (*Id.*, Ex. A, Ill. App. Ct. Order at 7-14.) Navarro filed a petition for leave to appeal to the Illinois Supreme Court

raising these same two claims. (*Id.*, Ex. H, Pet. for Leave to Appeal.) The petition was denied. (*Id.*, Ex. I, Ill. S. Ct. Order.)

Thereafter, Navarro filed a *pro se* petition for state post-conviction relief raising various claims of ineffective assistance of counsel. (*Id.*, Ex. U, Post-Conviction Pet. at 20-41.) The trial court denied the petition. (*Id.*, Ex. J, Tr. Ct. Order at 60-69.) Navarro appealed, asserting one claim: That his appellate counsel was ineffective in failing to raise an argument based on the admission of the gang-related evidence at trial. (*Id.*, Appellate Br. at 1-19.) The Illinois appellate court affirmed the denial of post-conviction relief. (*Id.*, Ex. B, Ill. App. Ct. Order.) Navarro then filed a *pro se* petition for leave to appeal to the Illinois Supreme Court, reiterating the same claim. (*Id.*, Ex. M, Pet. for Leave to Appeal.) His petition was denied. (*Id.*, Ex. N, Ill. S. Ct. Order.)

Navarro then filed his Petition in this Court. (R. 19, Pet.) He raises the following claims: (1) there was insufficient evidence to support his conviction; (2) the trial court erroneously permitted Garcia to testify regarding Navarro's statement that he wanted to join his brother in prison; and (3) his counsel on direct appeal was deficient in failing to raise an argument based on the admission of gang-related evidence at trial. (*Id.* at 5.) Respondent answered the Petition and submitted the applicable state court records. (R. 15, Answer; R. 16, State Ct. R.) Navarro filed a reply in support of the Petition. (R. 20, Reply.)

## LEGAL STANDARD

The Petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under AEDPA, the Court can grant an application for habeas relief if it meets the stringent requirements of 28 U.S.C. § 2254(d), set forth as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under this deferential standard, the Court must "attend closely" to the decisions of state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). A state court decision is contrary to federal law if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court or reaches an opposite result in a case involving facts materially indistinguishable from relevant U.S. Supreme Court precedent. *Bell v. Cone*, 535 U.S. 685, 694 (2002). The Court may grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from U.S. Supreme Court precedent but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). The state court's decision must be more than incorrect or erroneous; it must be "objectively" unreasonable. *Id.* This is a difficult standard to meet: "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). To obtain relief, a habeas petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

## ANALYSIS

### I. Sufficiency of the Evidence

Navarro first claims that there was insufficient evidence to support his conviction; in his view, the state's witnesses gave testimony that was "unsatisfactory, improbable, or beyond belief." (R. 19, Pet. at 5.) The Respondent argues that this claim fails on the merits. (R. 15, Answer at 13-18.) Under the Due Process Clause, a defendant cannot be convicted unless the state proves all the elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *In re Winship*, 397 U.S. 358, 364 (1970). When considering a sufficiency of the evidence claim on federal habeas review, the Court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The Court's role in reviewing such a claim is limited, and it may not reweigh the evidence or substitute its own judgment for that of the trier of fact. *Ford v. Ahitow*, 104 F.3d 926, 939 (7th Cir. 1997).

A sufficiency of the evidence claim premised on witness credibility is particularly difficult to prove. *See McFowler v. Jaimet*, 349 F.3d 436, 456 (7th Cir. 2003). To find in favor of the petitioner on such a claim, the Court must determine not only that the witness was unreliable as a matter of law, "but that no court could reasonably think otherwise." *Id.* The Court considers the reliability of a witness's identification of the defendant under the "totality of the circumstances." *Id.* at 449 (*quoting Neil v. Biggers*, 409 U.S. 188, 199 (1972)). Factors bearing on the Court's consideration include "the opportunity of the witness to view the criminal

at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior

description of the criminal, the level of certainty demonstrated by the witness at the

confrontation, and the length of time between the crime and the confrontation." *Id.*

Navarro raised a sufficiency of the evidence claim on direct appeal.[2] (R. 16, State Court

Record, Ex. A, Illinois Appellate Court Order at 7-11.) In rejecting this claim, the Illinois Court

of Appeals applied a standard consistent with *Jackson*, which the court encapsulated as follows:

"Where [a] defendant challenges the sufficiency of the evidence to sustain a conviction, the

standard of review is whether, after viewing the evidence in the light most favorable to the State,

any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."[3] (*Id.* at 7.) Applying that standard, the court found sufficient evidence to

support Navarro's conviction. (*Id.*) The court analyzed the claim as follows:

> [Navarro] was identified as the shooter by State witnesses Escobedo, Datil, and Garcia. [Navarro] claims, however, that each of their identifications is unreliable.
>
> The factors to be considered in evaluating the reliability of identification testimony are: (1) the witness' opportunity to view the offender at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior

[2] Under Illinois law, the crime of murder occurs when a person kills an individual without lawful justification and either intends to kill or do great bodily harm to that individual, or knows that his actions will cause death to the individual. 720 Ill. Comp. Stat. 5/9-1(a). Attempted murder occurs when an individual intends to commit first degree murder and commits any act that constitutes a substantial step toward the commission of that offense. 720 Ill. Comp. Stat 5/8-4(a). Aggravated discharge of a firearm occurs when an individual knowingly or intentionally discharges a firearm in the direction of another person. 720 Ill. Comp. Stat 5/24-1.2(a)(2) Navarro does not argue that any of these elements were missing in his case, but rather that the witnesses' identification of him as the perpetrator were faulty. The identity of the defendant as the perpetrator of the crime is an essential element of the offense that must be proven beyond a reasonable doubt. *McFowler*, 349 F.3d at 454.

[3] A state court need not cite to or even be aware of U.S. Supreme Court precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). Here, the state court cited to an Illinois Supreme Court case, which in turn relied on *Jackson. See People v. Hall*, 743 N.E.2d 521, 536 (Ill. 2000).

description; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. Slim, 127 Ill. 2d at 307-08.

[Navarro] maintains that Escobedo's identification was unreliable under each of the five Slim factors because: he only observed the shooter's face for two seconds, made that observation under distracting circumstances, gave an initial description of the [Navarro] in a lineup, and identified [Navarro] in court more than two years after the shooting.

The record shows, however, that Escobedo had multiple opportunities to view the shooter's face. Prior to the shooting he saw him from across the street and while he approached and shot Lucena. He also saw [Navarro] from a distance of four or five feet immediately after the shooting, and again when he shot at Escobedo during his flight. Escobedo's description of [Navarro] at trial was corroborated by the descriptions made by Datil and Garcia, and by the pictures from the surveillance video. Although the description that Escobedo gave to Officer Luciano differed somewhat from that he gave in court, it is the responsibility of the trier of fact to resolve such conflicts or inconsistencies in the testimony. People v. Dean, 207 Ill. App. 3d 640, 643 (1990). Discrepancies of this nature are not uncommon, and, of themselves, do not raise a reasonable doubt of guilt where a positive identification has been made. Slim, 127 Ill. 2d at 309. Here, where Escobedo positively identified [Navarro] in a photo array just 10 days after the shooting, and positively identified him again in court (People v. Wardell, 230 Ill. App. 3d 1093, 1098 (1992)), we find no basis for interfering with the jury's resolution of the discrepancies in his description (Slim, 127 Ill. 2d at 312-13).

[Navarro] next contends that Datil's identification was also unreliable. He points out that Datil only saw the shooter's face for a quick second, that he was scared when he made that observation, that he never provided an initial description of the shooter, and identified [Navarro] in a lineup more than one month after the shooting.

The record shows that Datil viewed [Navarro's] face from a distance of four to five feet, for one or two seconds, and made eye contact with him. Such an observation has been held sufficient to support a valid identification. People v. McKinley, 69 Ill. 2d 145, 152 (1977). Moreover, Datil observed [Navarro] pointing a gun at the car after the shooting, then positively identified him at the lineup a little more than a month after the incident, (People v. Cox, 377 Ill. App. 3d 690, 699 (2007)), and again at trial. In addition, his description of [Navarro's] clothing was corroborated by the testimony of the other State witnesses and the pictures from the surveillance video. Under these circumstances, we hold that the Slim reliability factors weigh in favor of the State, and the brevity of Datil's observation of [Navarro] and the surrounding circumstances do not render his identification unreliable. Slim, 127 Ill. 2d at 314-15.

[Navarro] also contends that Garcia was not a credible witness because he was a convicted felon and gang member, and his involvement in the shooting and status as a suspect provided him with a motive to fabricate testimony. We note, however, that it is the responsibility of the jury to determine the witness' credibility, the weight to be given to their testimony, and to resolve any inconsistencies therein. People v. Brooks, 187 Ill. 2d 91, 132 (1999).

In this case, Garcia's testimony was corroborated by the accounts given by Escobedo and Datil, as well as by the surveillance pictures. The jury was aware of Garcia's criminal background and was instructed that Garcia's accomplice testimony was subject to suspicion, and should therefore be viewed with caution, when it drew its conclusions regarding its believability. People v. Young, 128 Ill. 2d 1, 51-52 (1989). Based on the evidence presented, we find no reason to substitute our decision for that made by the jury in accepting the testimony presented by the State's witnesses. Young, 128 Ill. 2d at 52.

In sum, after viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found that [Navarro] was identified as the shooter beyond a reasonable doubt.

(R. 16, State Ct. R., Ex. A, Ill. App. Ct. Order at 7-11.)

Based on the record, the state court's determination was not an unreasonable application

of *Jackson*. As the court outlined, to the extent there were issues pertaining to the credibility of

the witnesses, the jury was made well aware of them. The jury learned about Garcia's extensive

criminal record during direct examination, including that he was incarcerated at the time of the

trial. Navarro's counsel questioned Garcia at length on cross-examination about the

circumstances surrounding the statements he made to police; he elicited testimony from Garcia,

as well as the investigating officers, to suggest that Garcia had a motive to falsely implicate

Navarro in the shooting. Navarro's counsel also questioned the other two witnesses extensively

about their opportunity to view the shooter and the circumstances surrounding their out-of-court

identifications, including eliciting testimony that they initially identified another person from the

photo arrays. (*See* R. 16, State Ct. R., Exs. Q-S, Trial Tr. at B23-F11.)

Notwithstanding these issues, the jurors—who had the opportunity to observe these witnesses first-hand—chose to credit their testimony. The jury's credibility determination "commands great deference." *McFowler*, 349 F.3d at 456 ("The finder of fact is uniquely situated to observe how well a witness's demeanor withstands the rigors of cross-examination and the exposure of inaccuracies and inconsistencies in her story."). There was nothing inherently implausible about the account of any of these witnesses. As the state court noted, Datil made eye contact with Navarro at a distance of four or five feet, provided a description of his clothing that matched the surveillance photos of the shooter, and identified Navarro from a photo array as well as in court. (R. 16, State Ct. R., Ex. A, Ill. App. Ct. Order at 3-4.) Escobedo observed Navarro from across the street, then at a distance of approximately four or five feet, and again as he shot at Escobedo. He also identified Navarro from a photo array and at trial. (*Id.* at 1-2.) Garcia, who knew Navarro for several years, described how Navarro told him to wait in a nearby alley, and how just as he lost sight of Navarro he heard several gun shots. He testified that he then saw Navarro running toward the car with Escobedo chasing him. Garcia also testified about the statement Navarro made to him that he "didn't care" about the shooting because he wanted to join his brother in prison. (*Id.* at 4-5.) To the extent there were issues with any one particular witness, the Court notes that three unrelated witnesses identified Navarro as the shooter. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[I]t is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar."). Based on the record, the state court's resolution of Navarro's sufficiency of the evidence claim was not objectively unreasonable. Accordingly, claim one is denied.

## II. Due Process Violation Based on the Admission of Garcia's Statement

In claim two, Navarro asserts that the trial court violated his federal due process rights in admitting his statement to Garcia about wanting to join his brother in prison. (R. 19, Pet. at 5.) Respondent argues that this claim is procedurally defaulted. (R. 15, Answer at 18-24.) Before considering the merits of claim contained in a habeas petition, the Court must ensure that the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). The exhaustion requirement is premised on concerns of comity: the state courts must be given the first opportunity to address and correct violations of their prisoner's federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claims in one complete round of state review. *Boerckel*, 526 U.S. at 845.

The companion procedural default doctrine precludes the Court from reaching the merits of a claim when either: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state procedural ground; or (2) the claim was not presented to the state courts and it is clear those courts would now find the claim procedurally barred under state law. *Coleman v. Thompson*, 501 U.S. 722, 735 (1991); *Perruquet*, 390 F.3d at 514. When a habeas petitioner fails to fairly present his claim to the state courts and the opportunity to raise that claim has now passed, the claim is procedurally defaulted. *Perruquet*, 390 F.3d at 514.

Upon review, Navarro did not properly present a federal due process claim in one complete round of state review. To properly exhaust, a petitioner must "present both the operative facts and the legal principles that control each claim" at each level of state review. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). This includes alerting the state court to

the "federal nature" of the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Navarro did not do that in this case. Instead, he based his claim entirely on state law. His appellate brief did not cite to any federal cases, nor did it cite to or discuss any principles of federal constitutional law. (R. 16, State Ct. R., Ex. C, Appellate Br. at 17-18.) Instead, counsel argued in general terms that the trial court "abused its discretion" in admitting the statement. (*Id.*) This did not sufficiently alert the state court that he intended to raise a federal claim. *See Wilson v. Briley*, 243 F.3d 325, 328 (7th Cir. 2001) ("Abuse of discretion" and "improper factors" are not terms that Illinois lawyers and judges, by quirk of local legal idiom, use to articulate constitutional arguments. . . . To the contrary, abuse-of-discretion arguments are ubiquitous, and most often they have little or nothing to do with constitutional safeguards."). Navarro's claim of state law error is not cognizable in this proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas relief is only available for a violation of the U.S. Constitution or other federal laws); *Earls v. McCaughtry*, 379 F.3d 489, 495 (7th Cir. 2004) (federal habeas court cannot "second-guess state courts in interpreting state law"). Nor can he assert a federal claim here that he did not raise in state court. *Lewis*, 390 F.3d at 1025. Because Navarro did not properly present this claim to the state court, the claim is procedurally defaulted.

A habeas petitioner can overcome a procedural default by showing both cause for failing to properly exhaust a claim in state court and a resulting prejudice. *See Wainwright v. Sykes*, 433 U.S. 72, 90 (1977). Cause sufficient to excuse procedural default is defined as "some objective factor external to the defense" which prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A habeas petitioner may also overcome a procedural default by establishing that the Court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536

(2006); *Coleman*, 501 U.S. at 750. Under this narrow exception, the petitioner must establish that "a constitutional violation has probably resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*, 513 U.S. 298, 323 (1995).

Navarro does not specifically address whether he can establish cause and prejudice to excuse his default. Given his *pro se* status, the Court has considered whether he could advance an argument based on his appellate counsel's failure to assert a federal claim on this ground as cause to excuse his default. Attorney error rising to the level of ineffective assistance of counsel can constitute cause to set aside a procedural default. *Coleman*, 501 U.S. at 753-54; *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). However, the exhaustion doctrine requires that an ineffective assistance claim be presented to the state court as an independent claim before it may be used to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). If the ineffective assistance claim was itself not properly exhausted in state court, the petitioner will be considered "fully defaulted." *Dellinger v. Bowen*, 301 F.3d 758, 766-67 (7th Cir. 2002). Here, Navarro did not present an independent claim to the state court that his appellate counsel was deficient in failing to challenge the admission of the statement on federal grounds. (*See* R. 16, State Court Record, Ex. J, Appellate Brief.) Accordingly, he is fully defaulted with respect to this claim.

The Court has also considered whether Navarro could satisfy the miscarriage of justice exception. A petitioner who asserts actual innocence "must *demonstrate* innocence; the burden is his, not the state's[.]" *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003). Moroever, actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). To support a claim of actual innocence, the petitioner must come forward with "new reliable evidence—whether it be exculpatory scientific evidence,

14

trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."
*Schlup*, 513 U.S. at 324. He must demonstrate that in light of new evidence, it is more likely
than not that no reasonable juror would find him guilty beyond a reasonable doubt. *See House v.
Bell*, 547 U.S. 518, 537 (2006). This is a difficult standard to meet, and such claims are "rarely
successful." *Schlup*, 513 U.S. at 324.

Upon review, Navarro does not meet this stringent standard. As outlined above, the
record contains significant evidence of Navarro's guilt, including the testimony of three
unrelated witnesses who saw him shoot Lucena in broad daylight. In the face of this evidence,
Navarro has not offered the type of compelling evidence— such as DNA evidence or witness
testimony establishing an alibi defense—that would establish his actual innocence. The only
"new" evidence contained in the record are two affidavits, Navarro's and his brother Angel's,
which he submitted in the post-conviction proceedings. (R. 16, State Ct. R., Ex. U, Post-
Conviction Pet. at 37-40.) In the affidavits, Navarro and his brother attest that after Angel killed
a member of the Ashland Vikings, the gang was looking to retaliate and "put out a revenge
contract" on both brothers. (*Id.* at 37.) They further claim that prior to the shooting, Angel told
Navarro not to go anywhere near Ashland Vikings territory and to avoid any altercations with its
members. (*Id.* at 37-40.) Navarro appears to believe that this proves he never would have gone
near the cell phone store or been involved in a shooting in that area.

This evidence falls short of establishing Navarro's actual innocence. First, testimony
from friends and family of the accused is significantly less probative than testimony from
witnesses with no motive to lie. *See House*, 547 U.S. at 552. The Court also must consider that
Angel himself is serving a sentence for murder. (*See* R. 16, State Ct. R., Ex. U, Post-Conviction
Pet. at 39.) In addition, the statements are not particularly exculpatory. If anything, the fact that

Navarro believed there was a contract out on his life could explain why he shot Lucena in front of several witnesses without any apparent provocation. In summary, Navarro has not established his actual innocence or any other basis for setting aside his procedural default. Accordingly, the Court cannot reach claim two on the merits.

## III. Ineffective Assistance of Appellate Counsel

In his final claim, Navarro asserts that his appellate counsel was deficient in failing to challenge the admission of gang-related evidence. (R. 19, Pet. at 5.) Respondent argues that this claim is also procedurally defaulted. (R. 15, Answer at 25-27.) Respondent acknowledges that Navarro raised this claim on post-conviction appellate review, but asserts that he failed to properly raise the claim in his post-conviction petition filed in the state trial court. (*Id.* at 26.) Under Illinois law, a claim must be contained in the post-conviction petition or it is deemed to be waived. 725 Ill. Comp. Stat. 5/122-3. A habeas petitioner's failure to comply with a state procedural rule provides an adequate and independent state ground that blocks federal review. *Coleman*, 501 U.S. at 735. However, for this doctrine to apply, the state court must "clearly and expressly" base its judgment on the state procedural bar. *Harrison v. McBride*, 428 F.3d 652, 664 (7th Cir. 2005); *see also Richardson v. Lemke*, 745 F.3d 258, 269 (7th Cir. 2014) (for a claim to be procedurally defaulted on the basis of an adequate and independent state procedural ground, "[t]he state court must actually have relied on that rule" to resolve the petitioner's claim). Any ambiguity in the court's opinion is construed in favor of the petitioner. *Richardson*, 745 F.3d at 269. Here, the Illinois appellate court did not find Navarro's claim to be waived, nor did it otherwise rely on a state procedural rule to deny the claim. Rather, the court rejected the claim on the merits. (R. 16, State Ct. R., Ex. B, Ill. App. Ct. Order at 6-7.) Accordingly, the procedural default doctrine does not bar the Court from considering this claim.

Turning to the merits, under the Sixth Amendment, a criminal defendant is entitled to "effective assistance of counsel—that is, representation that does not fall below an objective standard of reasonableness in light of prevailing professional norms." *Bobby v. Van Hook*, 558 U.S. 4, 16 (2009). To prevail on such a claim, the petitioner must show (1) counsel's performance was deficient and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). On the deficiency prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices[.]" *Harrington*, 131 S. Ct. at 788. "[C]ounsel need not be perfect, indeed not even very good, to be constitutionally adequate." *McAfee v. Thurmer*, 589 F.3d 353, 355-56 (7th Cir. 2009) (internal citation omitted). The Court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a habeas proceeding: "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

Further, counsel is given significant discretion in selecting a trial strategy based on the information known to him at the time. *See Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011) ("The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."); *United States v. Lathrop*, 634 F.3d 931, 938 (7th Cir. 2011) (if counsel's decisions were not "so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient"). The Court must avoid employing the benefit of hindsight, and must respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore*, 131 S. Ct. 733, 741 (2011).

On the prejudice prong, the petitioner must show there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Harrington*, 131 S. Ct. at 791. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 792.

A claim of ineffective assistance of appellate counsel is also subject to the *Strickland* analysis. *See Howard v. Gramley*, 225 F.3d 784, 789-90 (7th Cir. 2000). On the deficiency prong, the petitioner must show that counsel failed to present a "significant and obvious issue" on appeal without a legitimate strategic reason for doing so. *Id.* at 790. However, counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). On the prejudice prong, the petitioner must demonstrate that if the argument had been raised, there is "a reasonable probability that his case would have been remanded for a new trial or that the decision of the state trial court would have been otherwise modified on appeal." *Howard*, 225 F.3d at 790. Where the petitioner wanted counsel to raise an argument that had no merit, an ineffective assistance claim cannot succeed: "Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996).

On post-conviction review, the state court considered Navarro's claim that appellate counsel was deficient in failing to challenge the admission of the gang-related evidence on direct

appeal.[4] (R. 16, State Ct. R., Ex. B, Ill. App. Ct. Order 6-7.) The court applied a standard

consistent with *Strickland*, determining that Navarro could not show prejudice in connection

with this claim because the evidence was properly admitted under state law. (*Id.* at 7.) The court

observed that gang-related evidence is admissible under Illinois law to show that the defendant

had a motive to commit the offense, or to explain an otherwise unexplainable act. (*Id.* at 6-7.)

The state court concluded that the admission of the gang-related evidence was proper under this

standard, as it offered a possible motive for Navarro's unprovoked shooting of Lucena. (*Id.*)

This Court is bound by the state court's determination of state law in deciding whether counsel

was ineffective in failing to challenge the admission of this evidence. *See Huusko v. Jenkins*,

556 F.3d 633, 637 (7th Cir. 2009) ("[A] federal court cannot issue a writ of habeas corpus that

rests on a belief that a state court has misunderstood or misapplied state law."); *Earls*, 379 F.3d

at 495 ("[B]ecause it is not our place to second-guess state courts in interpreting state law we

must find that the State court did not make an unreasonable application of *Strickland* when it

found counsel's failure to object to testimony . . . did not constitute deficient performance.").

Because the state court determined that an argument based on the admission of this evidence

would have been unavailing under state law, Navarro has not established deficient performance

or prejudice in connection with this claim. *See Stone*, 86 F.3d at 717.

Additionally, in assessing counsel's performance, the court must "evaluate [counsel's]

performance as a whole rather than focus on a single failing or oversight." *Ebert v. Gaetz*, 610

---

[4] Trial counsel unsuccessfully sought to exclude all evidence pertaining to Navarro's gang affiliation, including his statements to Garcia after the shooting. (R. 16, State Court Record, Ex. P, Trial Tr. at A7-10.) The trial court concluded that the evidence was admissible to offer a possible motive for Navarro's actions, since Navarro and his brother were members of the same gang, his brother had been involved in the shooting of a rival gang member, and members of the rival gang were present at the scene of the shooting. (*Id.*) The court further concluded that the evidence was not unduly prejudicial, particularly since several state witnesses were also gang members. (*Id.*)

F.3d 404, 411 (7th Cir. 2010); *see also Sussman v. Jenkins*, 636 F.3d 329, 351 (7th Cir. 2011) ("[I]t is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks."). As noted above, appellate counsel is not required to raise every non-frivolous argument, but rather may select from among them in order to maximize the likelihood of success on appeal. *Smith*, 528 U.S. at 288.

Here, counsel filed a 19-page appellate brief on Navarro's behalf, raising two substantive issues. (R. 16, State Ct. R., Ex. C, Appellate Br.) Counsel's primary argument challenged the sufficiency of the evidence; if successful, this argument would have resulted in a reversal of Navarro's conviction, and under state law he could not be retried for the offense. *See People v. Brown*, 1 N.E.3d 888, 900 (Ill. 2013) ("When a reviewing court reverses a conviction based on evidentiary insufficiency, the constitutional prohibition against double jeopardy. . . precludes the State from retrying the defendant."). Given the lack of physical evidence linking Navarro to the crime and the issues surrounding the out-of-court identifications, counsel did not act unreasonably in focusing on this argument. Nor can the Court conclude that an argument pertaining to admission of the gang-related evidence would have been significantly stronger than the arguments counsel chose to raise. Indeed, the Illinois appellate court concluded on post-conviction review that a challenge to the admission of the gang evidence would have been unavailing under Illinois law. (R. 16, State Ct. R., Ex. B, Ill. App. Ct. Order at 5-7.) There is nothing to indicate that this argument would have fared any better on direct appeal. Therefore, Navarro cannot make the necessary showing of prejudice. *See Stone*, 86 F.3d at 717 (where state court rejected argument on post-conviction review in connection with its ineffective assistance

analysis, petitioner failed to establish prejudice based on counsel's failure to raise that argument on direct appeal).

Navarro argues in his reply that "regardless of state evidentiary rules this court can determine whether the ruling violated the Constitution." (R. 20, Reply at 31.) In support he cites to *Sussman v. Jenkins*, 636 F.3d 329 (7th Cir. 2011), but *Sussman* stands for a more limited proposition. There, the court held that a habeas petitioner could establish prejudice in connection with an ineffective assistance claim because the state court's evidentiary determination made in connection with the claim itself violated federal law. *Sussman*, 636 F.3d at 352-58. In other words, when a state court evidentiary ruling is "based on a misapprehension of federal law" which "necessarily affects its *Strickland* calculus," the federal court is not required to "ignore that error in evaluating the reasonableness of the state-court action." *Sussman v. Jenkins*, 642 F.3d 532, 535-36 (7th Cir. 2011) (Ripple, J., in chambers).

Here, by contrast, there is no suggestion that the state's evidentiary determination was based on a "misapprehension" of federal law. *See United States v. Abel*, 469 U.S. 45 (1984) (approving admission of evidence of gang membership where it had probative value); *see also United States v. Thomas*, 86 F.3d 647, 652 (7th Cir. 1996) ("This Court has long recognized that gang membership has probative value under appropriate circumstances."); *United States v. Rodriguez*, 925 F.2d 1049, 1053 (7th Cir. 1991) (evidence of gang membership was admissible to show motive for robbery); *United States v. McKinney*, 954 F.2d 471, 479 (7th Cir. 1992) (evidence of gang membership was admissible "to present the complete picture of the murder and conspiracy"). Nor is this a situation where the state court overlooked a federal constitutional claim that was squarely presented to it. *See Harris v. Thompson*, 698 F.3d 609, 624 (7th Cir. 2012). Navarro did not present any claim in the state proceedings that the admission of the gang

evidence violated his federal constitutional rights, and instead based his claim entirely on state evidentiary law. (R. 16, State Ct. R., Ex. J, Post-Conviction Br. at 11-18.)

Even if Navarro could overcome these hurdles, federal habeas relief is not available in connection with a state court's evidentiary ruling unless the ruling was "so prejudicial that it compromise[d] the petitioner's due process right to a fundamentally fair trial." *Howard v. O'Sullivan*, 185 F.3d 721, 723-24 (7th Cir. 1999). "This means that the error must have produced a significant likelihood that an innocent person has been convicted." *Id.* at 724. Navarro does not meet this exacting standard. As outlined above, the state presented the testimony of three witnesses who independently identified Navarro as the shooter. One of them, Datil, was a bystander with no connection to the shooting and no apparent reason to lie about what he saw. In addition, two of the state's key witnesses (Garcia and Escobedo) also admitted to being involved in gang activity. (R. 16, State Ct. R., Ex. Q, Trial Tr. at B45, B113.) As the state trial court observed, any prejudice Navarro suffered as a result of this evidence likely impacted the jury's evaluation of the state's witnesses too. (*Id.*, Ex. P, Trial Tr. at A8-10.) Based on the record, the Court cannot conclude that the admission of the gang evidence likely resulted in the conviction of an innocent person. For these reasons, the state court's resolution of Navarro's ineffective assistance claim was not objectively unreasonable. Accordingly, claim three is denied.

## IV.    Certificate of Appealability

As a final matter, pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the Court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable

jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). As is fully explained above, Navarro's claims are procedurally defaulted or otherwise without merit under AEDPA standards. Nothing before the Court suggests that jurists of reason would debate the outcome of the Petition or find a reason to encourage Navarro to proceed further. Accordingly, the Court declines to issue him a certificate of appealability.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Petition (R. 19), and DENIES the petitioner a certificate of appealability. The Clerk of Court is DIRECTED to enter judgment consistent with this order.

ENTERED:

Chief Judge Rubén Castillo
United States District Court

Dated: September 24, 2014

23